IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | CIVIL NO. 13-00486 SOM-KSC |
| Plaintiff, | ) ) | ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |
| vs. | ) ) | (ECF NO. 68); ORDER DENYING DEFENDANT TROY LYNDON'S |
| TROY LYNDON, et al., | ) ) | MOTION FOR SANCTIONS (ECF NO. 81), MOTION TO QUASH (ECF NO. |
| Defendants. | ) ) ) | 90), MOTION FOR PERMANENT STAY OF CONSENT AND JUDGMENT (ECF NO. 101), AND REQUEST TO |
| _____ | ) | EXTEND MOTIONS DEADLINE (ECF NO. 127); ORDER AFFIRMING MAGISTRATE JUDGE ORDER CONCERNING DISCOVERY AND REJECTING APPEALS BY DEFENDANT TROY LYNDON (ECF NOS. 112 AND 118) |

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 68); ORDER DENYING DEFENDANT TROY LYNDON'S MOTION FOR SANCTIONS (ECF NO. 81), MOTION TO QUASH (ECF NO. 90), MOTION FOR PERMANENT STAY OF CONSENT AND JUDGMENT (ECF NO. 101), AND REQUEST TO EXTEND MOTIONS DEADLINE (ECF NO. 127); ORDER AFFIRMING MAGISTRATE JUDGE ORDER CONCERNING DISCOVERY AND REJECTING APPEALS BY DEFENDANT TROY LYNDON (ECF NOs. 112 AND 118)**

I.      **INTRODUCTION.**

        This case involves allegations of securities fraud.

        On October 30, 2013, a consent to entry of judgment and permanent injunction in favor of Plaintiff Securities and Exchange Commission ("SEC") was filed.  See ECF No. 20.  On November 1, 2013, the court entered its Judgment of permanent injunction and other relief against Defendant Troy Lyndon.  See ECF No. 22.

Before the court is the SEC's motion for summary judgment, seeking to establish the amount of monetary relief. The SEC calculates that Lyndon owes $3.3 million in disgorgement, plus prejudgment interest and a civil penalty.  <u>See</u> ECF No. 68. Lyndon, proceeding <u>pro se</u>, opposes the motion, arguing that he was mistaken as to the scope of the consent he signed and of the Judgment, and that the effect of those documents should therefore be stayed.  <u>See</u> ECF No. 101.

Lyndon has also filed his own motion, which seeks to quash the SEC's motion for summary judgment and also seeks sanctions against the SEC for having allegedly threatened and intimidated him.  <u>See</u> ECF Nos. 81 and 90.  Lyndon appeals the Magistrate Judge's rejection of his requests for discovery and seeks an extension of the deadline to file motions.  <u>See</u> ECF Nos. 112, 118, and 127.

At a hearing on June 30, 2014, the court said that it was inclined to grant the SEC's motion, but not inclined to award the full amount requested.  The court also announced that it was inclined to deny all of Lyndon's motions and appeals.  At the conclusion of the hearing, the court took the motions and appeals under advisement.  Later that afternoon, Lyndon filed a request that this judge recuse herself.  This court refrained from ruling on the motions and the appeals while the motion to recuse was pending before a different judge.  On July 31, 2014, District

Judge Leslie E. Kobayashi denied the motion to recuse. <u>See</u> ECF Nos. 131 and 142.

The court now rules on the motions before it, granting the SEC's motion in part and denying it in part. The court grants the SEC the relief it requests, but reduces the amount of disgorgement. The court awards $3,251,169 in disgorgement, prejudgment interest of $289,897.18, and a civil penalty of $150,000. The court denies all of Lyndon's motions and affirms the Magistrate Judge's order that is the subject of Lyndon's appeal.

## II.      **FACTUAL BACKGROUND.**

The SEC filed the Complaint in this matter on September 24, 2013. <u>See</u> ECF No. 1.

On October 23, 2013, Lyndon executed a Consent of Defendant Troy Lyndon to Entry of Judgment of Permanent Injunction and Other Relief ("Consent"). This Consent was filed with the court on October 30, 2013. <u>See</u> ECF No. 20. In the Consent, Lyndon agreed to the entry of a judgment against him that 1) permanently enjoined him from violating certain securities laws; 2) prohibited him from acting as an officer or director of certain types of companies registered with the SEC or filing reports pursuant to the Exchange Act; and 3) prohibited him from participating in the offering of penny stocks. <u>See</u> <u>Id.</u>, PageID # 91. Lyndon also acknowledged that the entry of a

permanent injunction against him might have collateral consequences, including disqualification from participation in or association with certain organizations.  See Id., PageID # 93. Lyndon agreed not to deny the allegations in the Complaint or make any public statement to that effect.  Id., PageID #s 93-94.

The Consent included Lyndon's agreement to having this court "order disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange At, 15 U.S.C. § 77u(d)(3)."  Id.  Lyndon agreed that these amounts would be determined by this court based on a motion by the SEC, that prejudgment interest would run from August 4, 2011, and that, with respect to any such motion, Lyndon was 1) precluded from arguing that he had not violated the federal securities laws that were the subject of the Complaint in this matter; 2) agreeing not to challenge the validity of the Consent or the judgment thereon; and 3) for purposes of the motion, agreeing that the allegations of the Complaint were to be deemed to be true.  Id., PageID #s 91-92.  Accordingly, for purposes of this motion only, the court deems the allegations of the Complaint to be true instead of evaluating the factual record using the usual summary judgment standard.  To the extent this order talks about Zaucha's conduct, the court does not intend anything it says here to be binding on Zaucha.

Lyndon acknowledged in the Consent that he was entering into the agreement voluntarily, and that no "threats, offers, promises, or inducements of any kind have been made by the [SEC] or any member, officer, employee, agent, or representative of the [SEC} to induce [Lyndon] to enter into [the] Consent." Id., PageID # 92.

The Complaint alleges that Lyndon was the founder, chief executive officer, chief financial officer, and chairman of the board of Left Behind Games, Inc. See Complaint ¶¶ 3, 13, ECF No. 1, PageID #s 2, 4. It further alleges that Defendant Ronald Zaucha, a pastor, is Lyndon's close friend and has been a Left Behind Games consultant since 2008. Zaucha also owns a company called Lighthouse Distributors, Inc. See Complaint ¶¶ 3, 14, ECF No. 1, PageID # 2, 4. Lighthouse purportedly distributed video games, including Left Behind's games. Lyndon and Zaucha had a Lighthouse employee sign the distributor agreement on behalf of Lighthouse; Zaucha's name therefore did not appear on the agreement. The agreement called for Left Behind to sell its video games to Lighthouse and to ship them to Lighthouse, which was in the same building as Left Behind. Id. ¶ 58 and 60, PageID # 14-15. Lighthouse ceased operations in 2012, shortly after Left Behind ceased operations. Id. ¶ 19, PageID # 5.

As part of a fraudulent scheme, Left Behind, beginning in 2009, issued approximately 1.7 billion shares of its common

stock to Zaucha, supposedly in exchange for Zaucha's consulting services.  Id. ¶¶ 3-4, 23-27, 37, PageID #s 2, 6-8, 9-10.  During the time Zaucha was a Left Behind consultant, Left Behind was unprofitable and severely undercapitalized.  Id. ¶ 4, PageID # 2. The Complaint alleges that the consulting agreements between Zaucha and Left Behind were a "sham" designed to enable Zaucha to sell unregistered shares of Left Behind common stock and to "kick back" stock proceeds to Left Behind, which needed funds.  Id. ¶ 36, PageID # 9.

At Lyndon's direction, Zaucha "sold virtually all of this [Left Behind] stock, reaping approximately $4.6 million in sales proceeds.  Zaucha then kicked back approximately $3.3 million of these proceeds to the company in three ways."  Id. ¶ 4, PageID # 2.  First, Zaucha paid Left Behind $871,169 in "early-sell fees."  Id. ¶¶ 5, 97, PageID #s 2, 24.  Second, Zaucha's company, Lighthouse, purchased about $1.38 million of Left Behind's old inventory, then sold a fraction of this inventory for a few thousand dollars and gave most of it away. This indicates that the money allegedly paid for the inventory was actually for a different purpose.  Id. ¶¶ 6, 67-68, PageID #s 2-3, 15-16.  Finally, Zaucha also "kicked back" about $1 million to Left Behind in the form of "loans" and "investments." Id. ¶¶ 8, 97, PageID #s 3, 24.

Zaucha allegedly used $1.28 million from the Left Behind stock sales to pay his living expenses, to fund Lighthouse's operations, and to purchase property in Hawaii and California.  Id. ¶ 9, 97(d), PageID #s 3, 24.

The Complaint alleges that, relying on the scheme, Left Behind overstated its income on various filings with the SEC. See id. ¶ 7, PageID # 3; see also id. ¶ 63, PageID # 15 (alleging that Left Behind's Form 10-K indicated that its 2011 revenues increased $1,485,044 over the previous year as a result of Lighthouse's alleged purchases), ¶ 68 (alleging that Lighthouse gave away most of the Left Behind product and that Left Behind failed to disclose this in its financial statements and Forms 10-Q, 10-Q/A, and 10-K), ¶¶ 82, 85, 93-94 (alleging that Left Behind filed Forms 10-Q, 10-Q/A, and 10-K with false and misleading revenue statements relating to "sham transactions using the proceeds of the sale of Zaucha's stock").

The Complaint further alleges that Zaucha knew that, under SEC Rule 144, 17 C.F.R. § 230.144, the common stock he received could not be sold within a six-month period.  Id. ¶ 40, PageID # 10.  To get around this restriction, Lyndon sent faxes to Left Behind's stock transfer agent, asking that "New Restricted Stock Certificates" be issued to Zaucha with the following instruction, "Note, hold for 144 paperwork to remove legend."  The faxes also back-dated the beneficial ownership date

of the stock six months.  Id. ¶ 42, PageID # 10.  Ultimately, the

transfer agent removed the restrictive legends from the common

stock and sent the stock to Zaucha's brokerage accounts, from

which Zaucha offered and sold the shares into the market.  See

id. ¶ 47, PageID # 11.

As detailed in Paragraph 48 of the Complaint, between

August 4, 2009, and October 10, 2011, Zaucha had accounts at six

different brokerage firms from which he sold a total of more than

1.7 billion unregistered Left Behind shares for more than $4.6

million.  Id. ¶ 46, PageID # 12.  Lyndon instructed Zaucha what

price to sell the stock at and how to split the proceeds.  That

split included a "kick back" of $871,169 to Left Behind as an

"early sell fee."  Id. ¶ 49-50, PageID # 12-13.

The Complaint alleges that Lyndon was a signatory on

all Left Behind bank accounts and that he "treated corporate

accounts as his own, withdrawing funds for his personal use."

Id. ¶ 36, PageID # 9.

**III.     THE COURT DENIES LYNDON'S MOTION TO STAY THE CONSENT
         AND JUDGMENT (ECF NO. 101) AND DENIES HIS MOTION TO
         QUASH THE SEC'S MOTION FOR SUMMARY JUDGMENT (ECF NO.
         90).**

Lyndon seeks relief from the Consent and Judgment under

Rule 60(b)(1) of the Federal Rules of Civil Procedure, which

provides: "On motion and just terms, the court may relieve a

party . . . from a final judgment, order, or proceeding for the

following reasons: (1) mistake, inadvertence, surprise, or

8

excusable neglect[.]" Fed. R. Civ. P. 60(b)(1). "Motions for relief under Fed. R. Civ. P. 60(b) are addressed to the sound discretion of the trial court." Thompson v. Housing Auth. of Los Angeles, 782 F.2d 829, 832 (9th Cir. 1986). Rule 60(b)(1) motions should be liberally construed to assure that a case is tried on the merits and a just result is achieved. See Rodgers v. Watt, 722 F.2d 456, 459 (9th Cir. 1983). On the other hand, "there is a compelling interest in the finality of judgments which should not be lightly disregarded." Id. (citations and quotations omitted).

Lyndon claims he was the victim of a fraud because the Consent "was written in such a manner that it is impossible for anyone to fully understand without the assistance of an attorney." See ECF No. 101, PageID # 1107. Although there is no dispute that he signed the Consent, which expressly states that it is entered into voluntarily, Lyndon claims that the SEC "took full advantage" of his "psychological state" and that there was "no meeting of the minds." Id. He says that he was unaware that the Consent provided that, for purposes of a motion for summary judgment concerning disgorgement, the allegations of the Complaint were to be deemed true. Id., PageID # 1108. He also claims he was unaware that the Consent prohibited him from making any public statement denying the allegations of the Complaint.

Id. Lyndon also denies his involvement in the fraudulent scheme alleged in the Complaint.  Id., PageID # 1109.

Lyndon correctly notes that "[i]t is an elementary rule of contract law that there must be mutual assent or a meeting of the minds on all essential elements or terms in order to create a binding contract."  Malani v. Clapp, 56 Haw. 507, 510, 542 P.2d 1265, 1267 (1975).  However, a person who is aware that he or she has entered into a contract may not avoid its effect by failing to read it.  That is, mutual assent is not lacking when a person willingly declines to review a document available for review.  "Such a rule would undermine reliance on written instruments."  Douglass v. Pflueger Haw., Inc., 110 Haw. 520, 534 n.12, 135 P.3d 129, 143 n.12 (2006).  Accordingly, courts have rejected arguments that parties should not be bound by provisions in a contract just because they say they were unaware of the inclusion of those provisions in the contract.  In Leong by Leong v. Kaiser Foundation Hospitals, 71 Haw. 240, 245, 788 P.2d 164, 168 (Haw. 1990), for example, the Hawaii Supreme Court stated: "The general rule of contract law is that one who assents to a contract is bound by it and cannot complain that he has not read it or did not know what it contained."

Lyndon argues that, because he was unaware of certain obligations in the document he signed, he should be relieved of those obligations.  This argument is not sufficient to establish

10

a mistake for purposes of Rule 60(b)(1).  If Lyndon regrets

having signed an agreement, that regret does not give rise to a

right to retract the agreement and to posit different facts.

Lyndon knew what he had and had not done at the time he executed

the agreement, so he cannot be said to have newly discovered

whether he had or had not committed the alleged acts.

Moreover, although Lyndon argues that only an attorney

could interpret the Consent, he does not say that the SEC denied

him the opportunity to consult with an attorney before executing

the Consent.  At most he says he could not afford to pay an

attorney.  He does not attribute his financial straits to the

SEC.  More importanntly, he does not identify specific passages

that were incomprehensible to him.  For example, one portion of

the Consent that Lyndon's motion appears to hinge on contains no

legalese at all.  That portion says that, solely for the purposes

of an SEC motion seeking disgorgement and/or civil penalties from

Lyndon, "the allegations of the Complaint shall be accepted as

and deemed true by the Court."  ECF No. 20, ¶ 3.  It is hard to

see how not having been able to afford an attorney to interpret

that language somehow relates to a violation of constitutional

rights.  Nor does Lyndon identify other specific language that he

needed an attorney's help to decipher.

Because Lyndon fails to demonstrate any reason

justifying relief from the Consent and subsequent Judgment, his

motion to stay the effect of those documents is denied. Similarly, to the extent Lyndon seeks to "quash" the SEC's motion for summary judgment, ECF No. 90, his motion is denied, as Lyndon's request is unaccompanied by persuasive reasoning or authority.

## IV.  LYNDON IS NOT ENTITLED TO THE DISCOVERY HE NOW REQUESTS.

On April 4, 2014, Lyndon filed a motion to compel the SEC to provide him with discovery.  See ECF No. 76.  On May 5, 2014, the Magistrate Judge orally denied that request.  See ECF No. 114.  On May 8, 2014, the Magistrate Judge issued a written ruling, stating that the "discovery sought by Lyndon is not relevant to the issue remaining before the Court, which is a determination with regards to the amounts of disgorgement and Civil Penalties owed by Lyndon."  ECF No. 115, PageID 1347.  The Magistrate Judge reasoned that, based on the Judgment of November 1, 2013, issues of discovery concerning facts that would vindicate Lyndon or establish that he acted properly were no longer before the court.  Id.

Lyndon appealed the oral and written denials of his request for discovery.  See ECF Nos. 112 and 118.  Lyndon argues that, because he is seeking a stay of the Consent and subsequent Judgment, discovery with respect to liability issues is still relevant.  Given this court's denial of his motion to stay the Consent and Judgment, Lyndon's argument fails.  The court affirms

the discovery order of May 8, 2014.  This ruling terminates

Lyndon's appeals, ECF Nos. 112 and 118.

**V.        THE SEC'S MOTION FOR SUMMARY JUDGMENT IS GRANTED IN
           PART AND DENIED IN PART.**

The SEC's motion for summary judgment seeks a judgment

against Lyndon of $3.3 million in disgorgement, as well as

prejudgment interest and a civil penalty.  See ECF No. 68.  The

motion is granted in part and denied in part.

**A.    Applicable Standard.**

Under Rule 56 of the Federal Rules of Civil Procedure,

summary judgment shall be granted when "the movant shows that

there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ.

P. 56(a) (2010).  See Addisu v. Fred Meyer, Inc., 198 F.3d 1130,

1134 (9th Cir. 2000).  The movants must support their position

that a material fact is or is not genuinely disputed by either

"citing to particular parts of materials in the record, including

depositions, documents, electronically stored information,

affidavits or declarations, stipulations (including those made

for the purposes of the motion only), admissions, interrogatory

answers, or other materials"; or "showing that the materials

cited do not establish the absence or presence of a genuine

dispute, or that an adverse party cannot produce admissible

evidence to support the fact."  Fed. R. Civ. P. 56(c).

Paragraph 3 of the Consent, ECF No. 20, PageID # 92, allows this court to decide the present motion for summary judgment "without regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure." Accordingly, this court need not require a party to support factual assertions with evidence in the record, with evidence that would be admissible in evidence, or based on affidavits or declarations based on personal knowledge. Instead, for purposes of the present motion, the parties agreed that "the allegations of the Complaint shall be accepted as and deemed true." Id.

## B. Disgorgement.

District courts have broad equity powers to order disgorgement of ill-gotten gains obtained through violations of securities laws. Such disgorgement is designed to deprive a wrongdoer of unjust enrichment and to deter others from violating securities laws by making violations unprofitable. See SEC v. Platforms Wireless Int'l Corp., 617 F.3d 1072, 1096 (9th Cir. 2010); SEC v. JT Wallenbrock & Assocs., 440 F.3d 1109, 1113 (9th Cir. 2006); SEC v. First Pac. Bancorp, 142 F.3d 1186, 1192 (9th Cir. 1998). District courts have broad discretion in calculating disgorgement amounts. JT Wallenbrock, 440 F.3d at 1113. Disgorgement need only be a "reasonable approximation of profits causally connected to the violation." Platforms Wireless, 617 F.3d at 1096; First Pac. Bancorp, 142 F.3d at 1192 n.6. But the

14

amount of disgorgement should include all gains flowing from the violations.  JT Wallenbrock, 440 F.3d at 1113.

In Platform Wireless, the Ninth Circuit examined whether a proper disgorgement amount was limited to proceeds a defendant had personally benefitted from as a result of securities violations.  The Ninth Circuit did not so limit the disgorgement amount, instead holding that a person who controlled funds flowing from securities violations was liable "for the funds he or she dissipated as well as the funds he or she retained."  Platforms Wireless, 617 F.3d at 1097.  The defendant in Platforms Wireless who "had control over when and by whom the securities would be sold and hence how the proceeds would be used" was jointly and severally liable for all of the proceeds from the unlawful sale of securities even if that defendant did not personally benefit from all of those proceeds.  Id.

JT Wallenbrock similarly held individuals responsible for more than they actually received from the securities violations.  In that case, the defendants had schemed to obtain money under false pretenses to fund their business ventures.  The Ninth Circuit held that all of the proceeds obtained from investors were ill-gotten gains subject to disgorgement, even though some of the money was spent to cover operating expenses of the defendants' companies.  JT Wallenbrock, 440 F.3d at 1114. Citing SEC v. Great Lakes Equities Co., 775 F. Supp. 211, 215

(E.D. Mich. 1991), for the proposition that obtaining such funds benefits the wrongdoer because it defrays the wrongdoer's obligations, the Ninth Circuit determined that the defendants were liable for all of the proceeds obtained from the securities violations, not just the money that they obtained for their personal use. JT Wallenbrock, 440 F.3d at 1114.

Lyndon agreed in the Consent that this court would award a disgorgement amount against him. ECF No. 20, ¶ 3, PageID # 91. He also agreed that he had told Zaucha how to sell the securities that were part of the fraudulent scheme and how to "kick back" proceeds to Left Behind. Lyndon further agreed that he had controlled all of Left Behind's bank accounts and had used them as his own personal accounts. Like the Defendants in Platforms Wireless, Lyndon had controlled how the proceeds obtained from the violations of securities laws would be used. Lyndon is therefore liable for all of those funds. Platforms Wireless, 617 F.3d at 1097; JT Wallenbrock, 440 F.3d at 1114.

The SEC also seeks to hold Lyndon liable for disgorgement under 15 U.S.C. § 78t(a), which states, "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . , unless the controlling

person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."  The court is not persuaded by this argument, as the SEC fails to establish on this motion that Lyndon controlled a "person liable" for violations of securities laws.  Because the present record does not establish that another person or company is liable for having violated securities laws, Lyndon cannot be said to be jointly and severally liable for violations by another.  Lyndon himself has agreed not to deny that he violated securities laws.  The Consent cannot be read to establish liability on the part of Zaucha or Left Behind; Zaucha is contesting liability, and Left Behind is not a party in this case.

Having determined that Lyndon is liable for the proceeds of his own violations of securities laws, the court must determine the appropriate disgorgement amount.  The SEC bears the initial burden of demonstrating that the disgorgement amount it seeks against Lyndon "reasonably approximates the amount of unjust enrichment."  See Platforms Wireless, 617 F.3d at 1096.  Once the SEC meets that burden, the burden shifts to Lyndon to demonstrate that the figure is not a "reasonable approximation."  See id.  The Ninth Circuit places this burden on a defendant because information is not "obtainable at negligible costs."  Id.

(quotation marks and citation omitted).  A defendant is more likely to have access to relevant information.  Id.

The SEC is not seeking to hold Lyndon liable for disgorgement of all proceeds obtained from the sale of Left Behind stock by Zaucha.  Instead, citing the allegations in the Complaint, which Lyndon agreed the court should deem true for purposes of this motion, the SEC argues that Lyndon is responsible for $3.3 million in disgorgement.  But the Complaint at most alleges that Zaucha "kicked back approximately $3.3 million" to Left Behind.  Complaint ¶ 4 (emphasis added).  The alleged "kick backs" detailed in the Complaint actually total a little less than $3.3 million.  Specifically, the Complaint refers to three items: 1) Zaucha's payment to Left Behind of $871,169 in "early-sell fees," id. ¶¶ 5, 97, PageID #s 2, 24; 2) a purchase by Lighthouse of about $1.38 million of Left Behind's old inventory, which Lighthouse did not actually use, indicating that the money was not really paid for the inventory, id. ¶¶ 6, 67-68, PageID # 2-3, 15-16; and 3) Zaucha's "kick back" of about $1 million to Left Behind in the forms of "loans" and "investments," id. ¶¶ 8, 97, PageID #s 3, 24.  The sum of these amounts, which themselves include amounts of "about" certain figures, is $3,251,169.  The court concludes that the SEC meets its burden of demonstrating that $3,251,169 is a "reasonable approximation" of Lyndon's illicit gains based on the violations

of various securities laws.  At the hearing on the motions, the
SEC accepted $3,251,169 as an appropriate disgorgement amount
based on the papers before this court.  See Transcript of
Proceeding at 4, ECF No. 138, PageID # 1561.

The burden now shifts to Lyndon to demonstrate that
$3,251,169 is not a "reasonable approximation" of his illicit
gains.  His opposition to the motion and arguments at the hearing
cast no doubt on that figure, especially given his statements in
the Consent, including his agreement to this court's treatment of
the allegations in the Complaint as true.

### C.    Prejudgment Interest.

In the Consent, Lyndon agreed that this court "shall
order disgorgement of ill-gotten gains" and "prejudgment interest
thereon."  ECF No. 20, ¶ 3, PageID # 91.  In Platform Wireless,
the Ninth Circuit approved the calculation of prejudgment
interest based on the tax underpayment rate set forth in 26
U.S.C. § 6621.  Platform Wireless, 617 F.3d at 1099.

The SEC has submitted the Declaration of Carol Shau
setting forth a prejudgment interest calculation of $289,897.18
based on application of that statutory rate to the disgorgement
amount of $3,251,169.  See ECF No. 133-1.  The court concludes
that this is an appropriate amount of prejudgment interest.

### D. Civil Penalty.

In the Consent, Lyndon also agreed that this court "shall order . . . a civil penalty pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 78u(d)(3)." ECF No. 20, ¶ 3, PageID # 91. That provision allows this court to impose a civil penalty and creates three tiers of such penalties.

The first tier originally provided for a maximum penalty amount of $5,000 on a natural person or the gross amount of pecuniary gain as a result of a statutory violation. 15 U.S.C. § 78u(d)(3)(B)(i). This maximum penalty was increased to $7,500 as required by the Debt Collection Improvement Act of 1996. See 17 C.F.R. § 2001.1001 (increasing amount for violations occurring from December 1996 to February 2001 from $5,000 to $5,500); 17 C.F.R. § 2001.1002 (increasing amount for violations after February 2001 from $5,500 to $6,500); 17 C.F.R. § 2001.1004 (increasing amount for violations after March 2009 from $6,500 to $7,500).

The second tier originally provided for a maximum penalty of $50,000 on a natural person or the gross amount of pecuniary gain for a violation of securities laws involving "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." 15 U.S.C. § 78u(d)(3)(B)(ii). This maximum penalty was increased to $75,000 as required by the Debt Collection Improvement Act of 1996. See 17 C.F.R.

§ 2001.1001 (increasing amount for violations occurring from December 1996 to February 2001 from $50,000 to $50,000); 17 C.F.R. § 2001.1002 (increasing amount for violations from February 2001 from $55,000 to $60,000); 17 C.F.R. § 2001.1003 (increasing amount for violations from February 2005 from $60,000 to $65,000); 17 C.F.R. § 2001.1004 (increasing amount for violations after March 2009 from $65,000 to $75,000).

The third tier provided for a maximum penalty of $100,000 on a natural person or the gross amount of pecuniary gain for a violation of securities laws involving "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and involving violations that "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. § 78u(d)(3)(B)(iii). This maximum penalty was increased to $150,000 as required by the Debt Collection Improvement Act of 1996. See 17 C.F.R. § 2001.1001 (increasing amount for violations occurring from December 1996 to February 2001 from $100,000 to $110,000); 17 C.F.R. § 2001.1002 (increasing amount for violations from February 2001 from $110,000 to $120,000); 17 C.F.R. § 2001.1003 (increasing amount for violations from February 2005 from $120,000 to $130,000); 17 C.F.R. § 2001.1004 (increasing amount for violations from March 2009 from $130,000 to $150,000).

Civil penalties punish the wrongdoer and deter future violations.  See SEC v. Tourre, __ F. Supp. 2d __, 2014 WL 969442 (S.D.N.Y. Mar. 12, 2014).  Courts may award the maximum civil penalty for each violation of the Exchange Act.  See SEC v. Wilde, 2012 WL 6621747, *16 (C.D. Cal. Dec. 17, 2012).  Courts should set a civil penalty "in light of the facts and circumstances."  15 U.S.C. § 78u(d)(3)(B)(i).  A court may determine appropriate civil penalties by looking at the factors applicable to injunctive relief.  These factors include "(1) the degree of scienter involved; (2) the isolated or recurrent nature of the infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the likelihood, because of defendant's professional occupation, that future violations might occur; (5) and the sincerity of his assurances against future violations."  Wilde, 2012 WL 6621747, *16 (quotation marks and citation omitted).  A court may also examine a defendant's ability to pay the civil fine in determining the appropriate amount.  See SEC v. Jasper, 883 F. Supp. 2d 915, 931-32 (N.D. Cal. 2010).

The SEC seeks the $150,000 maximum civil penalty set forth in the third tier, arguing that Lyndon's violations detailed in the Complaint involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "directly or indirectly resulted in substantial losses or

created a significant risk of substantial losses to other persons." 15 U.S.C. § 78u(d)(3)(B)(iii). The SEC is seeking only a single $150,000 penalty, not a $150,000 penalty for each of Lyndon's violations or a penalty equal to the gross amount of pecuniary gain.

The court agrees that a $150,000 penalty is a reasonable civil penalty under the facts and circumstances of this case. Over a lengthy period of time, Lyndon perpetrated a fraud that caused people buying shares of Left Behind to invest about $4.6 million in a company that was not financially solvent. Left Behind received about $3.3 million of that money in "kick backs." The $150,000 amount represents a small fraction of the money involved in the fraudulent scheme. Lyndon has asserted that he is without funds but has not documented his financial status. It is certainly unclear where the nearly $3.3 million in "kick backs" has gone. Nor is it clear that Lyndon has "learned his lesson." Although he executed the Consent, which precludes him from denying that he violated securities laws and which bars him from certain positions involving companies subject to securities law, Lyndon has filed numerous pleadings in which he denies wrongdoing and complains about an inability to work in the securities industry. Under these circumstances, the court determines that a $150,000 civil penalty is appropriate.

**VI.     LYNDON'S REQUEST TO EXTEND THE DEADLINE FOR FILING A
         MOTION TO DISMISS IS DENIED.**

In his filing of June 16, 2014, Lyndon requests that
the court dismiss this case with prejudice or allow him to file a
motion to dismiss.  <u>See</u> ECF No. 127.  Lyndon, however, fails to
explain why dismissal is appropriate.  The court is granting the
SEC's motion for summary judgment, leaving no issues to be
determined with respect to Lyndon.  Accordingly, Lyndon's request
to extend the deadline to file motions is denied.

**IV.     CONCLUSION.**

The court grants the SEC's motion for summary judgment
in part.  To the extent it seeks disgorgement of $3.3 million,
the court denies the motion.  Instead, the court grants
disgorgement of $3,251,169, prejudgment interest of $289,897.18,
and a civil penalty of $150,000.  All motions by Lyndon are
denied and any order he appeals is affirmed.


IT IS SO ORDERED.

DATED: Honolulu, Hawaii, August 11, 2014.



                    /s/ Susan Oki Mollway
                    Susan Oki Mollway
                    Chief United States District Judge

<u>Securities and Exchange Commission v. Lyndon, et al.</u>, Civ. No. 13-00486 SOM/KSC; ORDER
DENYING MOTION TO STAY CONSENT AND JUDGMENT (ECF NO. 28); ORDER GRANTING IN
PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 68);
ORDER DENYING DEFENDANT TROY LYNDON'S MOTION FOR SANCTIONS (ECF NO. 81),
MOTION TO QUASH (ECF NO. 90), MOTION FOR PERMANENT STAY OF CONSENT
AND JUDGMENT (ECF NO. 101), AND REQUEST TO EXTEND MOTIONS DEADLINE (ECF NO.
127); ORDER AFFIRMING MAGISTRATE JUDGE ORDER CONCERNING DISCOVERY AND
REJECTING APPEALS BY DEFENDANT TROY LYNDON (ECF NOs. 112 AND 118)